UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

**FILED**

NOV 2 3 2020

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

UNITED STATES OF AMERICA,       )
                                )
              Plaintiff,        )
                                )
v.                              )       No.
                                )
JAMIE McCOY,                    )
                                )
              Defendant.        )

## INFORMATION

The United States Attorney charges:

## BACKGROUND

1.      At all relevant times, defendant Jamie McCoy ("Defendant") was a resident of
Cape Girardeau County, Missouri. From in or about 2013 to at least 2019, The Defendant was
employed in the health care field. Since in or about 2015, he has owned or operated several
durable medical equipment ("DME") companies, including AE Wellness, LLC, Summit Medical
Supply, Patriot Medical Supply, and DME Device Co.

2.      At all times relevant to this information, Brandy McKay ("McKay") was a
resident of Cape Girardeau County, Missouri. After receiving EMT training, the Defendant
worked in the health care field in various capacities, including as a medical assistant at the
Ferguson Medical Group in Sikeston, in the dialysis unit at St. Francis Hospital in Cape
Girardeau, Missouri, and as an office manager at Jackson Healing Arts from 2009 until 2015.
Since 2015, the Defendant has owned or managed at least ten companies that sold DME to
patients, including AE Wellness, MC Medical Supply, Integrity Medical Supply, and McKay
Management Co.

3.     At all relevant times, Jackson Preston Siples, III ("Siples") was a resident of Cape Girardeau County, Missouri. Since in or about 2017, Siples has been an employee of or an owner of several DME companies, including AE Wellness, Integrity Medical Supply, and Radiance Health Group.

4.     At various times relevant to this Information, the Defendant, McCoy, and Siples owned or operated companies that provided DME to patients and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for services the companies purportedly provided.

## Relevant Medicare Provisions

5.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings. Medicare Part B reimburses providers for DME that is medically necessary and ordered by a medical doctor or other qualified Medicare provider.

6.     The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A or Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments for enrolled beneficiaries to the Medicare Advantage programs.

7.     CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private entities

2

that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation (WPS) is the Part B MAC for Eastern Missouri and thus processes reimbursement claims for services provided and billed by Medicare providers in the Eastern District of Missouri.

8.     To receive Medicare reimbursement, providers must make an appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

9.     Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law.

**Enrollment in Medicare**

10.     Between December 2015 and December 2018, the Defendant, McCoy, and Siples completed and signed several Medicare enrollment applications. Contained in the enrollment applications was Section 13, entitled "Penalties for Falsifying Information" which informed the applicant that he or she could be criminally prosecuted for (a) executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program; or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services. Thus, the Defendant, McKay, and Siples received notice on multiple occasions of the penalties for providing false information to Medicare and also repeatedly certified that they

3

would comply with the laws, regulations, and policies applicable to Medicare.

11.     As part of the Medicare provider enrollment application for AE Wellness and

Patriot Medical Supplies, on or about December 12, 2015, December 12, 2016, January 11,

2017, and May 31, 2017, the Defendant signed the "Certification Statement" of the application

and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in
> the application. I understand that any deliberate omission, misrepresentation, or
> falsification of any information . . . contained in any communication supplying
> information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . .
> including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for
> payment by Medicare, and will not submit claims with deliberate ignorance or
> reckless disregard of their truth or falsity.

12.     Between November 13, 2017 and March 2, 2018, McKay completed several

Medicare provider enrollment applications, including one on or about November 13, 2017 for

MC Medical Supply, in which she identified herself as the owner/compliance officer. These

Medicare provider enrollment applications contained the same Section 13, "Penalties for

Falsifying Information," and Section 15, "Certification Statement," described above. Thus, the

Defendant received notice on multiple occasions of the penalties for providing false information

to Medicare and certified that he would comply with the laws, regulations, and policies

applicable to Medicare.

13.     Between November 13, 2017 and December 7, 2018, Siples completed several

Medicare provider enrollment applications, including one on or about November 13, 2017, for

Integrity Medical Supply, in which he identified himself as the owner/compliance officer. These

Medicare provider enrollment applications contained the same Section 13, "Penalties for

4

Falsifying Information," and Section 15, "Certification Statement," described above.

## Relevant Missouri Medicaid Provisions

14.     MO HealthNet administers the Missouri Medicaid Program, which is jointly

funded by the State of Missouri and the federal government. Missouri Medicaid reimburses

health care providers for covered services rendered to low-income Medicaid recipients.

15.     A Medicaid provider must enter into a written agreement with MO HealthNet to

receive reimbursement for medical services to Medicaid recipients and must agree to abide by

MO HealthNet regulations in rendering and billing for those services.

16.     On or about April 19, 2018, McKay, as an "owner/CEO," signed a Missouri

Medicaid provider agreement containing the following language:

> By my signature below, I, the applying provider, read and agree that, upon
> the acceptance of my enrollment, I will participate in the Vendor Payment plan. I
> am responsible for all services provided and all billing done under my provider
> number regardless to whom the reimbursement is paid. It is my legal responsibility
> to ensure that the proper billing code is used and indicate the length of time I
> actually spend providing services regardless to whom the reimbursement is paid. I
> agree to be financially responsible for all services, which are not documented. I
> agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and
> amendments thereto shall govern and control my delivery of services and further
> agree to the following terms:

> I agree that it is my responsibility to access manual materials that are
> available from DMS over the Internet. I will comply with the Medicaid manual,
> bulletins, rules, and regulations as required by the Division of Medical Services and
> the United State Department of Health and Human Services in the delivery of
> services and merchandise and in submitting claims for payment. I understand that
> in my field of participation I am not entitled to Medicaid reimbursement if I fail to
> so comply, and that I can be terminated from the program for failure to comply.

17.     Medicaid providers must retain, for five years from the date of service, fiscal and

medical records that reflect and fully document services billed to Medicaid and must furnish or

make the records available for inspection or audit by the Missouri Department of Social Services

5

or its representative upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

## Relevant Tricare Provisions

18.     Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

## Relevant Telemedicine Requirements

19.     Telemedicine, also referred to as telehealth medicine, is the use of information technology by doctors and other authorized health care providers to provide clinical health care from a distance. Telemedicine includes, but is not limited to, real-time audio or video communication between patients in one location and the doctor or authorized health care provider in another location. In all instances, telemedicine doctors or other authorized health care providers are required to conduct an evaluation and assessment sufficient to determine the patients' medical needs before prescribing or ordering any service or product, including DME equipment, genetic testing, and medications.

## Federal Anti-Kickback Statute

20.     Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b))

6

("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

21.     The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

22.     Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services.

## Count 1
## Health Care Fraud Scheme
## 18 U.S.C. §§ 1347(a)(1) and 2

23.     Paragraphs 1 to 22 are incorporated by reference as if fully set out herein.

24.     It was part of the scheme and artifice to defraud that the Defendant and his co-schemers incorporated and operated the businesses, identified below, and used these businesses as vehicles to commit the criminal offenses described in this Information.

**AE Wellness**

25.     On or about January 19, 2015, the Defendant incorporated AE Wellness, a DME company doing business as Summit Medical Supply, and listed himself as the organizer and registered agent. On or about August 30, 2016, AE Wellness became a Medicare provider.

7

26.     In February 2017, McKay began working for AE Wellness as the office manager and compliance officer. She was responsible for billing for AE Wellness and Patriot Medical Supplies, dealing with patient complaints, and handling Medicare audits.

27.     While employed at AE Wellness, the Defendant, McCoy, and Siples received Medicare compliance training, which included training on the federal Anti-Kickback Statute. They were informed and therefore knew it was illegal to solicit, offer, pay, or receive kickback payments in exchange for referring patients, items, and services which were to be reimbursed by Medicare or Medicaid.

28.     It was part of the scheme and artifice to defraud that the Defendant contracted with marketing firms to identify patients for AE Wellness. The marketing companies ran television and online ads offering orthotic braces, at no cost, to the patients. When a patient responded to the ad, an employee of the call center collected pertinent information, including the patient's name and address, name of the patient's primary care physician, insurance information, Medicare number, and areas of pain.

29.     It was further part of the scheme and artifice to defraud that the marketing company sent the patient information to a telemedicine doctor, who ordered the DME equipment. The telemedicine doctor had no prior doctor-patient relationship with the patients, in most cases did not directly communicate with the patients and did not evaluate or assess the patients' need for the DME and other items. The order signed by the doctor, called a "lead" or a "full lead," was then electronically transmitted to a marketing company, which sold the leads to DME companies.

30.     It was further part of the scheme and artifice to defraud that the Defendant solicited and paid marketing companies for leads sent to AE Wellness. While the fraud scheme

8

was ongoing, the Defendant used a number of individuals and marketing companies to generate leads and frequently changed companies because of the large number of patient complaints that AE Wellness received. Typically, the patients or the patient representatives complained that they had not requested and did not need or want the orthotic braces.

31.    One of the individuals from whom the Defendant bought leads was Aaron Williamsky, who for a period of time sent AE Wellness 100 to 300 leads per week. The Defendant and Williamsky agreed that Williamsky would receive 70-80% of the AE Wellness profits in return for Williamsky sending leads and paying for orthotic braces and the costs associated with shipping the braces to patients.

32.    At a later time, the Defendant reached an agreement with Rufus Joel French ("French") to buy both "raw" and "full" leads from R&L Senior Marketing ("R&L") which was owned by French. The Defendant paid R&L about $35 to $40 for each "raw lead," which was a lead that did not include a doctor's order and paid R&L about $280 to $300 for a "full lead," which was a lead that included a doctor's order. The Defendant paid R&L about $10,000 to $15,000 per month for leads.

33.    It was further part of the scheme and artifice to defraud that from about September 2016 until about August 2017, the Defendant and McKay submitted or caused AE Wellness to submit reimbursement claims, totaling $6,028,505, to Medicare and $67,955 to Tricare and further caused Patriot Medical Supplies to submit reimbursement claims to Tricare, totaling $23,951 for the DME provided to patients based on the leads. The Defendant and McKay knew that Medicare and Medicaid would not pay for items or services obtained by illegal kickbacks.

34.    On or about July 28, 2017, AE Wellness received and Siples signed for a letter

9

from AdvanceMed, a Medicare contractor, suspending AE Wellness' participation in the
Medicare Program. In the letter, AdvanceMed stated that AE Wellness was suspended because it
had paid illegal kickbacks to doctors in exchange for sending orders for orthotic braces to AE
Wellness and had billed the Medicare Program for medically unnecessary services when there
was no prior relationship between the ordering physician and the patients.

35.     It was further part of the scheme and artifice to defraud that after AE Wellness'
suspension, in or about August 2017, McCoy sold Patriot Medical Supply to French. As part of
the payment for Patriot Medical Supply, French increased the number of leads that R&L provided
to AE Wellness.

36.     The Defendant, McCoy, and Siples were all aware of the Medicare suspension
letter and knew the reasons Medicare suspended AE Wellness. To circumvent the Medicare
suspension, the Defendant, McCoy, and Siples decided to open new DME companies and to
conceal McCoy's involvement in the new DME companies.

37.     It was part of the scheme and artifice to defraud that the Defendant submitted, or
caused to be submitted, the following fraudulent reimbursement claims, among others, to the
health care benefit programs identified below:

| Patient | Date of Prescription | Date of Claim | Physician Listed on Prescription | DME Company | Insurer |
|---------|----------------------|---------------|----------------------------------|-------------|---------|
| A.L.    | 9/21/2016            | 9/21/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| B.B.    | 9/22/2016            | 9/22/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| M.J.    | 9/22/2016            | 9/22/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| B. E.   | 1/3/2017             | 1/3/2017      | Dr. Linda Stiles                 | AE Wellness | Medicare |
| K.D.    | 3/28/2017            | 3/28/2017     | Dr. Donna Gill                   | AE Wellness | Medicare |

## MC Medical Supply

38.     It was part of the scheme and artifice to defraud that in or about August 2017, one

10

month after AE Wellness' suspension, the Defendant and McKay agreed that the Defendant would open her own DME business, to be called MC Medical Supply ("MC Medical") and located in Cape Girardeau, Missouri. McKay invested $13,000 and the Defendant loaned McKay an additional $20,000 to start MC Medical. The Defendant and McKay agreed that the Defendant would be paid for his assistance and they would split MC Medical profits "50/50."

39.     It was part of the scheme and artifice to defraud that McKay completed the Medicare provider enrollment application for MC Medical on or about November 13, 2017 and again on March 2, 2018 and listed herself as the sole owner. McKay intentionally concealed the Defendant's involvement in MC Medical, despite being advised in the enrollment application that she could be prosecuted for submitting false information in the Medicare application. The Defendant and McKay feared that Medicare would not approve the application if the Defendant was involved, because the Defendant's company, AE Wellness, had just been suspended months before and AE Wellness still had not repaid Medicare for the payments received based on the earlier fraudulent claims.

40.     It was further part of the scheme and artifice to defraud that, just as he and McKay had done at AE Wellness, McKay paid illegal kickbacks for leads or doctors' orders that marketing companies sent to MC Medical. The amount McKay and MC Medical paid for a lead or order varied depending on the type of brace. The Defendant knew the telemedicine doctors ordering the DME and other items did not have a prior doctor-patient relationship with the patients, in most cases did not directly communicate with the patients, and did not evaluate or assess the patients' need for the DME and other items.

41.     It was further part of the scheme and artifice to defraud that the Defendant submitted or caused the following fraudulent reimbursement claims, among others, to be

11

submitted to the health care benefit programs identified below:

| Patient | Date of Prescription | Date of Claim | Physician Listed on Prescription | DME Company | Insurer |
|---------|---------------------|---------------|----------------------------------|-------------|---------|
| T.B. | 8/15/18 | 8/15/18 | Dr. Allen Imes | MC Medical | Tricare |
| P.H. | 10/10/2018 | 10/10/2018 | Dr. Kenneth Pelehac | MC Medical | Medicare |
| T.C. | 10/18/2018 | 10/18/2018 | Dr. Milagros Rivera | MC Medical | Medicare |
| T.B. | 10/18/2018 | 10/18/2018 | Dr. Roxanne Edwards | MC Medical | Medicare |
| A.B. | 10/30/2018 | 10/30/2018 | Dr. Scott Roethle | MC Medical | Medicare |
| P.N. | 1/22/2019 | 1/22/2019 | Dr. Donna Gill | MC Medical | Medicare |

42.     It was further part of the scheme and artifice that from June 5, 2018 to March 21,

2019, the Defendant and McKay submitted, and caused MC Medical to submit, false and

fraudulent reimbursement claims to Medicare, totaling $1,831,075, and reimbursement claims to

Tricare, totaling $15,540. At the time the false and fraudulent claims were submitted, the

Defendant knew that MC Medical paid illegal kickbacks for the referrals, knew Medicare would

not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not

pay for items or services which had not been determined to be medically necessary by a doctor

or an authorized health care professional.

**Integrity Medical Supply**

43.     It was further part of the scheme and artifice to defraud that on October 4, 2017,

with the Defendant's assistance, Siples incorporated Integrity Medical Supply ("Integrity

Medical"), a DME company in Cape Girardeau, Missouri. This was approximately two months

after AE Wellness was suspended by Medicare because of allegations of fraud. McCoy gave

Siples $10,000 to $12,000 to help him start Integrity Medical. McCoy and Siples agreed that

McCoy would be a "silent partner" and they would split the profits of Integrity Medical "50/50."

Siples and McCoy further agreed that Siples would pay McCoy "consulting" fees.

44.     It was further part of the scheme and artifice to defraud that on or about

12

November 13, 2017, with McKay's assistance, Siples completed a Medicare provider enrollment application for Integrity Medical. In the application, Siples identified himself as the owner, manager, and compliance officer for Integrity Medical Supply, but intentionally excluded information about the Defendant, despite the fact that the Defendant and Siples were partners in Integrity Medical.

45.     It was further part of the scheme and artifice to defraud that the Defendant and Siples continued the practice of paying illegal kickbacks for leads from marketing companies, just as they had done at AE Wellness. The amount the Defendant and Siples paid for a lead varied depending on the type of brace. The Defendant and Siples knew the telemedicine doctors ordering the DME and other items did not have a prior doctor-patient relationship with the patients, in most cases did not directly communicate with the patients, and did not evaluate or assess the patients' need for the DME and other items.

46.     It was further part of the scheme and artifice to defraud that from March 8, 2018 to March 13, 2019, the Defendant and Siples submitted, and caused Integrity Medical Supply to submit, false and fraudulent reimbursement claims to Medicare, totaling $6,027,173 and reimbursement claims to Tricare, totaling $145,614. At the time the claims were submitted, the Defendant and Siples knew that Integrity Medical Supply paid illegal kickbacks for referrals, knew Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized healthcare professional.

**Radiance Health Group**

47.     On or about July 9, 2018, Siples opened Radiance Health Group, LLC, a DME supply company located in Cape Girardeau. In or about December 7, 2018, Siples completed a

13

Medicare provider enrollment application for Radiance Health Group and identified himself as the owner, managing employee, and contact person for Radiance Health Group. The Defendant admits that from March 5, 2019 to March 27, 2019, Siples submitted and caused Radiance Health Group to submit false and fraudulent reimbursement claims to Medicare, totaling $922,562. The Defendant further admits that he received a share of the profits of Radiance Health Group, per his agreement with Siples.

## McKay Management Co. ("MMC")

48.    In or about June 2018, McKay, Siples, and French attended a marketing meeting in Memphis, TN to discuss the manner in which their businesses were working together. It was further part of the scheme and artifice to defraud that at the meeting, French proposed that R&L would provide marketing services to the DME companies, provide leads, and order and pay for the braces, which would permit the DME companies to fill orders for braces without any upfront out-of-pocket costs. The DME companies would then submit reimbursement claims to Medicare and other insurers and pay R&L after receiving the reimbursement payments. The DME companies would pay R&L for each lead received from R&L, pay for the braces purchased by R&L, and split the profits with R&L. The DME companies would receive 15% of the profits and French would receive 85% of the profits.

49.    It was further part of the scheme and artifice to defraud that Siples accepted French's offer. Thereafter, Siples received 15% of the profits of Integrity Medical and per his earlier agreement with the Defendant, gave the Defendant 7.5% of the profits.

50.    McKay did not accept French's profit-sharing offer. Instead, it was part of the scheme and artifice to defraud that the McKay and French agreed that she would manage the DME companies to whom R&L was sending leads. To perform this management function, in or

14

about July 2018, McKay opened McKay Management Co. At various times, McKay simultaneously managed: (a) MC Medical; (b) Integrity Medical; (c) Radiance Health Group located in Cape Girardeau, MO and owned by Siples; (d) Cherry Medical Supply located in Chattanooga, TN and owned by Curtis French; (e) Paradise Medical Solutions located in Miami Gardens, FL and owned by Lateese Ford; (f) Helpful Home located in Miami Gardens, FL and owned by Terrance French and Lateese Ford; (g) Perfect Motion located in Holiday, FL and owned by Terrance French; (h) Embrace of Clearwater located in Clearwater, FL, and owned by Lateese Ford; (i) M&M Medical located in Conyers, GA and owned by Marcus Moon; and (j) JLynn Medical Supply located in Atlanta, GA and owned by Lateese Ford. The Defendant, as directed by French, charged the DME companies $250 for each lead or patient referred to the DME companies.

51.     It was further part of the scheme and artifice to defraud that McKay assisted French in acquiring and setting up new DME companies, in which French's ownership interest was concealed. McKay knew the reason French acquired multiple DME companies was to "stay under the radar" of Medicare, which was more likely to scrutinize and audit a company submitting a large number of claims for orthotic braces.

52.     McKay's responsibilities as the manager of these DME companies included handling licensure for the DME companies, completing Medicare enrollment applications for the companies, instructing the office staff at the DME companies how to handle calls from patients, and creating spreadsheets and other documents reflecting the purchase and sale of orthotic braces and reimbursements for the DME. The Defendant visited each of the DME companies once every three months and was paid $6,500 per month for each DME company that she managed.

53.     As a part of her duties, at the end of the month, McKay calculated the total

reimbursements received by each DME company and then calculated the 85/15 profit split. For

example, McKay determined that in August 2018, Integrity Medical received $213,124.77 in

reimbursements for orthotic braces provided to 309 patients. From this reimbursement amount,

French and R&L received $77,250, or $250 for each of the 309 patients R&L referred to

Integrity Medical, and an additional $55,797.85 as his 85% share of Integrity Medical's profit for

the month. Siples received $9,846.68 or 15% of Integrity Medical's profit of $65,644.53 for

August 2018. The Defendant received $4923. 34, per his agreement with Siples.

54.     The Defendant knew that these payments to French and R&L were in violation of

the federal Anti-Kickback Statute because the payments were solicited, paid, or received for the

express purpose of inducing or rewarding French and R&L for referring patients to DME

companies for items and services that were reimbursed by Medicare.

55.     The Defendant also knew that the DME companies submitted claims for orthotic

braces when no physician or qualified health care professional had determined the patients' need

for the braces. As an example, the Defendant knew that some of the DME companies that he

managed submitted reimbursement claims for knee braces. He and French knew that range of

motion tests had to be performed to determine the medical necessity for knee braces and that the

telemedicine doctors signing the orders could not perform the required range of motion tests by

phone.

**Execution of the Fraud Scheme**

56.     On or about March 28, 2017, in the Eastern District of Missouri and elsewhere,

**JAMIE McCOY,**

the Defendant herein, knowingly and willfully executed and attempted to execute, the above

described scheme or artifice to defraud Medicare, Tricare, and Missouri Medicaid, which are

16

health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the Defendant submitted, and caused to be submitted, a false reimbursement claim to the Medicare Program for Patient K.D., based on a prescription dated March 28, 2017 and obtained by paying a telemedicine doctor illegal kickbacks for signing prescriptions for orthotic braces that had not been determined to be medically necessary by a doctor or other qualified health care provider, were not medically necessary, and were not requested nor wanted by the patients.

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

The United States Attorney further charges:

## Count 2
## False Statements Concerning Health Care Matters
## 18 U.S.C. §§ 1035(a)(2) and 2

57.     Paragraphs 1 to 22 and 24 to 55 are incorporated by reference as if fully set out herein.

58.     On or about March 28, 2017, in the Eastern District of Missouri,

### JAMIE McCOY,

the Defendant herein, in a matter involving a health care benefit program, knowingly and willfully made and used a materially false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, that is, the Defendant knowingly and willfully submitted, or caused to submitted, to the Medicare Program a reimbursement claim for Patient K.D., that falsely and fraudulently stated that Dr. Donna Gill had determined Patient K.D. needed orthotic braces.

All in violation of Title 18, United States Code, Section 1035(a)(2) and Title 18, United States Code, Section 2.

17

The United States Attorney further charges:

## Count 3
## Illegal Kickbacks for Referrals
## 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2

59.     Paragraphs 1 to 22 and 24 to 55 are incorporated by reference as if fully

set out herein.

60.     On or about the dates indicated below, the Defendant caused MC Medical

to send, via wire transfer, illegal kickback payments to R&L Marketing for prescriptions

for orthotic braces that R&L Marketing sent or caused to be sent to MC Medical Supply:

| Date of Kickback Payment | Amount of Kickback Payment | Paid to | Payor |
|---|---|---|---|
| 11/27/2017 | $8,045 | R&L Marketing | MC Medical |
| 11/28/2017 | $7,835 | R&L Marketing | MC Medical |
| 2/5/2018 | $8,920 | R&L Marketing | MC Medical |
| 2/7/2018 | $7,000 | R&L Marketing | MC Medical |
| 4/6/2018 | $12,000 | R&L Marketing | MC Medical |

61.     On or about November 27, 2017, in the Eastern District of Missouri,

### JAMIE McCOY,

the Defendant herein, did knowingly and willfully offer and pay remuneration, (including a

kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to

R&L Marketing, to induce R&L Marketing to purchase and order, and to arrange for and

recommend the purchasing and ordering, of a good and service, for which payment may be made

in whole or in part under a federal program, that is, the Defendant paid R&L Marketing $8,045

for prescriptions for orthotic braces that R&L Marketing sent or caused to be sent to MC Medical

Supply.

18

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

The United States Attorney further finds by probable cause that:

1.      Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 42, United States Code, Section 1320a-7b or Title 18, United States Code, Sections 1035 and 1347, as set forth in Counts 1, 2 and 3, the Defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2.      Specific property subject to forfeiture includes, but is not limited to, the following:

   a.      2016 Chevrolet Suburban K1500; VIN: 1GNSKHKC2GR314111; and

   b.      2017 Nissan Rogue SL, VIN: 5N1AT2MV8HC805991.

3.      If any of the property described above, as a result of any act or omission of the Defendant:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the court;

   d.      has been substantially diminished in value; or

   e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

DOROTHY L. McMURTRY, #37727(MO)
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri    63102
(314) 539-2200

UNITED STATES OF AMERICA    )
SOUTHEASTERN DIVISION      )
EASTERN DISTRICT OF MISSOURI  )

I, Dorothy L. McMurtry, Assistant United States Attorney for the Eastern District of

Missouri, being duly sworn, do say that the foregoing information is true as I verily believe.


DOROTHY L. McMURTRY, #37727(MO)


Subscribed and sworn to before me this _23_ day of ~~September~~ November, 2020.


CLERK, U.S. DISTRICT COURT

By: _____
               DEPUTY CLERK