UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| JAMIE McCOY, | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are defendant **Jamie McCoy** ("the Defendant"), represented by defense

counsel **Shanna Surratt**, and the United States of America (hereinafter "United States" or

"Government"), represented by the Office of the United States Attorney for the Eastern District

of Missouri. This agreement does not, and is not intended to, bind any governmental office or

agency other than the United States Attorney for the Eastern District of Missouri. The Court is

neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the

Defendant's waiver of indictment and voluntary plea of guilty to Counts 1, 2, and 3 of the

Information, the United States agrees that no further federal criminal prosecutions will be

brought in this District relative to the Defendant's (a) solicitation, receipt, offer, or payment of

illegal kickbacks in exchange for referrals of patients to durable medical equipment ("DME")

companies, medical testing laboratories, and pharmacies for DME, genetic testing, and

1

prescription medications (collectively referred to as "Health Care Services") and (b) the creation, use, and submission of false documents related to health care matters, including patient records and reimbursement claims for Health Care Services, from about September 2016 to March 2019, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that the Defendant may request a sentence below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court, pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request. The Government reserves the right to oppose such a request and to recommend a sentence within the U.S. Sentencing Guidelines range.

## 3. ELEMENTS:

As to Count 1, the defendant admits to knowingly violating Title 18, United States Code, Sections 1347(a)(1) and 2, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of executing a health care fraud scheme are:

*One*, the defendant knowingly executed or attempted to execute a scheme to defraud a health care benefit program;

*Two*, the defendant did so with the intent to defraud;

*Three*, the defendant did so in connection with the payment for health care benefits or services; and

*Four,* the Medicaid and Medicare Programs are health care benefit programs.

As to Count 2, the defendant admits to knowingly violating Title 18, United States Code, Sections 1035(a)(2) and 2, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of making false statements related to health care matters are:

*One*, the defendant voluntarily and intentionally used a document containing a false or fraudulent statement;

*Two*, at the time the defendant did so, he knew that the document contained a false or fraudulent statement;

*Three*, the false or fraudulent statement was material to the Medicare and Medicaid Programs; and

*Four*, the Missouri Medicare and Medicaid Programs are health care benefit programs.

As to Count 3, the defendant admits to knowingly violating Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2, and admits there is a factual basis for the plea and further fully understands that the elements of the crime of offering and paying illegal kickbacks for referrals are:

*One*, the defendant offered or paid remuneration in return for referring an individual for an item or service;

*Two,* one purpose for which the remuneration was offered or paid was to induce or reward referrals for an item or service;

*Three*, the item or service was to be paid in whole or in part under a federal health care program; and

*Four,* the defendant knew that his conduct was wrongful.

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

a.    At all relevant times, the Defendant was a resident of Cape Girardeau County, Missouri. From in or about 2013 to at least 2019, the Defendant was employed in the health care field. Since in or about 2015, he has owned or operated several DME companies, including AE Wellness, LLC, Summit Medical Supply, Patriot Medical Supply, and DME Device Co.

b.    At all relevant times, Brandy McKay ("McKay") was a resident of Cape Girardeau County, Missouri. After receiving EMT training, McKay worked in the health care field in various capacities, including as a medical assistant at the Ferguson Medical Group in Sikeston, in the dialysis unit at St. Francis Hospital in Cape Girardeau, Missouri, and as an office manager at Jackson Healing Arts from 2009 until 2017. Since 2017, she has been employed by, owned, or managed at least ten companies that sold DME to patients, including AE Wellness, Patriot Medical Supplies, MC Medical Supply, Integrity Medical Supply, and McKay Management Co.

c.    At all relevant times, Jackson Preston Siples, III ("Siples") was a resident of Cape Girardeau County, Missouri. Since in or about 2017, Siples has been an employee of or an owner of several DME companies, including AE Wellness, Integrity Medical Supply, and Radiance Health Group.

d.    At relevant times, the Defendant, McKay, and Siples owned or operated companies that provided DME to patients and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for

4

Health Care Services the companies purportedly provided.

**Relevant Medicare Provisions**

e.     The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program, which is a federal health care benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings. Medicare Part B reimburses providers for DME that is medically necessary and ordered by a medical doctor or other qualified Medicare provider.

f.     The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A or Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments for enrolled beneficiaries to the Medicare Advantage programs.

g.     CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation (WPS) is the Part B MAC for Eastern Missouri and thus processes reimbursement claims for services provided and billed by Medicare providers in the Eastern District of Missouri.

h.     To receive Medicare reimbursement, providers must make an appropriate

5

application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

      i.     Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law.

**Enrollment in Medicare**

      j.     Between December 2015 and December 2018, the Defendant, McKay, and Siples completed and signed several Medicare enrollment applications. Contained in the enrollment applications was Section 13, entitled "Penalties for Falsifying Information" which informed the applicant that he or she could be criminally prosecuted for (a) executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program; or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services. Thus, the Defendant, McKay, and Siples received notice on multiple occasions of the penalties for providing false information to Medicare and also repeatedly certified that they would comply with the laws, regulations, and policies applicable to Medicare.

      k.     As part of the Medicare provider enrollment application for AE Wellness and Patriot Medical Supplies, on or about December 12, 2015, December 12, 2016, January 11, 2017, and May 31, 2017, the Defendant signed the "Certification Statement" of the applications and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].

> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

l.      Between November 13, 2017 and March 2, 2018, McKay completed several Medicare provider enrollment applications, including one on or about November 13, 2017, for MC Medical Supply, in which she identified herself as the "owner/compliance officer." These Medicare provider enrollment applications contained the same Section 13, "Penalties for Falsifying Information," and Section 15, "Certification Statement," described above.

m.      Between November 13, 2017 and December 7, 2018, Siples completed several Medicare provider enrollment applications, including one on or about November 13, 2017, for Integrity Medical Supply, in which he identified himself as the "owner/compliance officer." These Medicare provider enrollment applications contained the same Section 13, "Penalties for Falsifying Information," and Section 15, "Certification Statement," described above.

### Relevant Missouri Medicaid Provisions

n.      MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to low-income Medicaid recipients.

o.      A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO HealthNet regulations in rendering and billing for those services.

p.      On or about April 19, 2018, McKay, as the "owner/CEO," signed a Missouri Medicaid provider agreement containing the following language:

By my signature below, I, the applying provider, read and agree that, upon the acceptance of my enrollment, I will participate in the Vendor Payment plan. I am responsible for all services provided and all billing done under my provider number regardless to whom the reimbursement is paid. It is my legal responsibility to ensure that the proper billing code is used and indicate the length of time I actually spend providing services regardless to whom the reimbursement is paid. I agree to be financially responsible for all services, which are not documented. I agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and amendments thereto shall govern and control my delivery of services and further agree to the following terms:

I agree that it is my responsibility to access manual materials that are available from DMS over the Internet. I will comply with the Medicaid manual, bulletins, rules, and regulations as required by the Division of Medical Services and the United State Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment. I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply.

q.      Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services or its representative upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

## **Relevant Tricare Provisions**

r.      Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management

8

responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

## Relevant Telemedicine Requirements

s.     Telemedicine, also referred to as telehealth medicine, is the use of information technology by doctors and other authorized health care providers to provide clinical health care from a distance. Telemedicine includes, but is not limited to, real-time audio or video communication between patients in one location and the doctor or authorized health care provider in another location. In all instances, telemedicine doctors or other authorized health care providers are required to conduct an evaluation and assessment sufficient to determine the patients' medical needs before prescribing or ordering any service or product, including DME equipment, genetic testing, and medications.

## Federal Anti-Kickback Statute

t.     Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

u.     The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

v.     Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that

9

could affect the medical judgment of those providing or referring patients for health care services.

**Description of the Conspiracy and Fraud Scheme**

w.    The Defendant admits that he and his co-schemers incorporated and operated the businesses, identified below, and used these businesses as vehicles to commit the criminal offenses described below.

**AE Wellness**

x.    On or about January 19, 2015, the Defendant incorporated AE Wellness, a DME company doing business as Summit Medical Supply, and listed himself as the organizer and registered agent. On or about August 30, 2016, AE Wellness became a Medicare provider.

y.    The Defendant admits that in February 2017, McKay began working for AE Wellness as the office manager and compliance officer. He further admits that McKay was responsible for billing for AE Wellness and Patriot Medical Supplies, dealing with patient complaints, and handling Medicare audits.

z.    The Defendant admits that from about April 2017 to late 2017, Siples was in charge of day-to-day operations at AE Wellness.

aa.    The Defendant admits that while employed at AE Wellness, he, McKay, and Siples, received Medicare compliance training, which included training on the federal Anti-Kickback Statute. They were informed and knew it was illegal to solicit, offer, pay, or receive kickback payments in exchange for referring patients, items, and services which were to be reimbursed by Medicare or Medicaid.

bb.    The Defendant further admits that he contracted with marketing firms to identify patients for AE Wellness. The marketing companies ran television and online ads offering

10

orthotic braces, at no cost, to the patients. When a patient responded to the ad, an employee of the call center collected pertinent information, including the patient's name and address, name of the patient's primary care physician, insurance information, Medicare number, and areas of pain.

cc.     The Defendant further admits that the marketing company sent the patient information to a telemedicine doctor, who ordered the DME equipment. The telemedicine doctor had no prior doctor-patient relationship with the patients, in some cases did not directly communicate with the patients, and did not evaluate or assess the patients' need for the DME and other items. The order signed by the doctor, called a "lead" or a "full lead," was then electronically transmitted to a marketing company, which sold the leads to DME companies.

dd.     The Defendant further admits that he solicited and paid marketing companies for leads sent to AE Wellness. While the fraud scheme was ongoing, the Defendant used a number of individuals and marketing companies to generate leads and frequently changed companies because of the large number of patient complaints that AE Wellness received. Typically, the patients or the patient representatives complained that they had not requested and did not need or want the orthotic braces.

ee.     One of the individuals from whom the defendant bought leads was Aaron Williamsky, who for a period of time sent AE Wellness 100 to 300 leads per week. The Defendant and Williamsky agreed that Williamsky would receive 70-80% of the AE Wellness profits in return for Williamsky sending leads and paying for orthotic braces and the costs associated with shipping the braces to patients.

ff.     The Defendant admits that he reached an agreement with Rufus Joel French ("French") to buy both "raw" and "full" leads from R&L Senior Marketing ("R&L") which was owned by French. The Defendant paid R&L about $35 to $40 for each "raw lead," which was a

11

lead that did not include a doctor's order and paid R&L about $280 to $300 for a "full lead," which was a lead that included a doctor's order. The Defendant further admits he paid R&L about $10,000 to $15,000 per month for leads.

gg.     The Defendant admits the Government evidence will establish that from about September 2016 until about August 2017, he and McKay submitted or caused AE Wellness to submit reimbursement claims, totaling $6,028,505, to Medicare and $67,955 to Tricare and further caused Patriot Medical Supplies to submit reimbursement claims to Tricare, totaling $23,951, for the DME provided to patients based on the leads. The Defendant admits that he and McKay knew Medicare, Medicaid, and Tricare would not pay for items or services obtained by illegal kickbacks.

hh.     On or about July 28, 2017, AE Wellness received and Siples signed for a letter from AdvanceMed, a Medicare contractor, suspending AE Wellness' participation in the Medicare Program. In the letter, AdvanceMed stated that AE Wellness was suspended because it had paid illegal kickbacks to doctors in exchange for sending orders for orthotic braces to AE Wellness and had billed the Medicare Program for medically unnecessary services when there was no prior relationship between the ordering physician and the patients.

ii.     After AE Wellness' suspension, the Defendant sold Patriot Medical Supply to French in or about August 2017. The Defendant admits that, as part of the payment for Patriot Medical Supply, French increased the number of leads that R&L provided to AE Wellness.

jj.     The Defendant admits that he, McKay, and Siples were all aware of the Medicare suspension letter and knew the reasons Medicare suspended AE Wellness. To circumvent the Medicare suspension, the Defendant, McKay, and Siples decided to open new DME companies and to conceal the Defendant's involvement in the new DME companies.

12

kk.     The Defendant further admits that he submitted, or caused to be submitted, the following fraudulent reimbursement claims, among others, to the health care benefit programs identified below:

| Patient | Date of Prescription | Date of Claim | Physician Listed on Prescription | DME Company | Insurer |
|---------|---------------------|---------------|----------------------------------|-------------|---------|
| A.L.    | 9/21/2016           | 9/21/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| B.B.    | 9/22/2016           | 9/22/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| M.J.    | 9/22/2016           | 9/22/2016     | Dr. Linda Stiles                 | AE Wellness | Medicare |
| B. E.   | 1/3/2017            | 1/3/2017      | Dr. Linda Stiles                 | AE Wellness | Medicare |
| K.D.    | 3/28/2017           | 3/28/2017     | Dr. Donna Gill                   | AE Wellness | Medicare |

**MC Medical Supply**

ll.     The Defendant admits that in or about August 2017, one month after AE Wellness' suspension, he and McKay agreed that McKay would open her own DME business, to be called MC Medical Supply ("MC Medical") and located in Cape Girardeau, Missouri. McKay invested $13,000 and the Defendant loaned McKay an additional $20,000 to start MC Medical. The Defendant and McKay agreed that they would split MC Medical profits "50/50."

mm.     The Defendant admits that McKay completed the Medicare provider enrollment application for MC Medical on or about November 13, 2017 and again on March 2, 2018 and listed herself as the sole owner. The Defendant and McKay intentionally concealed the Defendant's involvement in MC Medical, despite being advised in the enrollment application that they could be prosecuted for submitting false information in the Medicare application. The Defendant and McKay feared that Medicare would not approve the application if the Defendant was involved, because the Defendant's company, AE Wellness, had just been suspended months before and AE Wellness still had not repaid Medicare for the payments received based on the earlier fraudulent claims.

13

nn.     The Defendant admits that, just as they had done at AE Wellness, McKay paid illegal kickbacks for leads or doctors' orders that marketing companies sent to MC Medical. The amount McKay and MC Medical paid for a lead or order varied depending on the type of brace. The Defendant admits that he knew the telemedicine doctors ordering the DME and other items did not have a prior doctor-patient relationship with the patients, in most cases did not directly communicate with the patients, and did not evaluate or assess the patients' need for the DME and other items.

oo.     The Defendant admits that McKay submitted or caused the following fraudulent reimbursement claims, among others, to be submitted to the health care benefit programs identified below:

| Patient | Date of Prescription | Date of Claim | Physician Listed on Prescription | DME Company | Insurer |
|---------|----------------------|---------------|----------------------------------|-------------|---------|
| T.B. | 8/15/18 | 8/15/18 | Dr. Allen Imes | MC Medical | Tricare |
| P.H. | 10/10/2018 | 10/10/2018 | Dr. Kenneth Pelehac | MC Medical | Medicare |
| T.C. | 10/18/2018 | 10/18/2018 | Dr. Milagros Rivera | MC Medical | Medicare |
| T.B. | 10/18/2018 | 10/18/2018 | Dr. Roxanne Edwards | MC Medical | Medicare |
| A.B. | 10/30/2018 | 10/30/2018 | Dr. Scott Roethle | MC Medical | Medicare |
| P.N. | 1/22/2019 | 1/22/2019 | Dr. Donna Gill | MC Medical | Medicare |

pp.     The Defendant admits that from June 5, 2018 to March 21, 2019, the Defendant and McKay submitted and caused MC Medical to submit false and fraudulent reimbursement claims to Medicare, totaling $1,831,075 and reimbursement claims to Tricare, totaling $15,540. At the time the false and fraudulent claims were submitted, the Defendant knew that MC Medical paid illegal kickbacks for the referrals, knew Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized health care professional.

**Integrity Medical Supply**

qq.     The Defendant admits that on October 4, 2017, with his assistance, Siples incorporated Integrity Medical Supply ("Integrity Medical"), a DME company in Cape Girardeau, Missouri. This was approximately two months after AE Wellness was suspended by Medicare because of allegations of fraud. The Defendant gave Siples $10,000 to $12,000 to help him start Integrity Medical. The Defendant and Siples agreed that the Defendant would be a "silent partner" and they would split the profits of Integrity Medical "50/50." The Defendant and Siples further agreed that Siples would pay the Defendant in "consulting" fees.

rr.     The Defendant admits that on or about November 13, 2017, with McKay's assistance, Siples completed a Medicare provider enrollment application for Integrity Medical. In the application, Siples identified himself as the owner, manager, and compliance officer for Integrity Medical Supply, but intentionally excluded information about the Defendant, despite the fact that the Defendant and Siples were partners in Integrity Medical.

ss.     The Defendant admits that he and Siples continued the practice of paying illegal kickbacks for leads from marketing companies, just as they had done at AE Wellness. The amount the Defendant and Siples paid for a lead varied depending on the type of brace. The Defendant and Siples knew the telemedicine doctors ordering the DME and other items did not have a prior doctor-patient relationship with the patients, in most cases did not directly communicate with the patients, and did not evaluate or assess the patients' need for the DME and other items.

tt.     The Defendant admits that from March 8, 2018 to March 13, 2019, Siples submitted, and caused Integrity Medical Supply to submit, false and fraudulent reimbursement claims to Medicare, totaling $6,027,173 and reimbursement claims to Tricare, totaling $145,614.

At the time the claims were submitted, the Defendant and Siples knew that Integrity Medical Supply paid illegal kickbacks for referrals, knew Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized healthcare professional.

**Radiance Health Group**

uu.     On or about July 9, 2018, Siples opened Radiance Health Group, LLC, a DME supply company located in Cape Girardeau. In or about December 7, 2018, Siples completed a Medicare provider enrollment application for Radiance Health Group and identified himself as the owner, managing employee, and contact person for Radiance Health Group. The Defendant admits that from March 5, 2019 to March 27, 2019, Siples submitted and caused Radiance Health Group to submit false and fraudulent reimbursement claims to Medicare, totaling $922,562. The Defendant further admits that he received a share of the profits of Radiance Health Group, per his agreement with Siples.

**McKay Management Co. ("MMC")**

vv.     In or about June 2018, McKay, Siples, and French attended a marketing meeting in Memphis, TN to discuss the manner in which their businesses were working together. At the meeting, French proposed that R&L would provide marketing services to the DME companies, provide leads, and order and pay for the braces, which would permit the DME companies to fill orders for braces without any upfront out-of-pocket costs. The DME companies would then submit reimbursement claims to Medicare and other insurers and pay R&L after receiving the reimbursement payments. The DME companies would pay R&L for each lead received from

R&L, pay for the braces purchased by R&L, and split the profits with R&L. The DME companies would receive 15% of the profits and French would receive 85% of the profits.

ww.     The Defendant admits that Siples accepted French's offer. Thereafter, Siples received 15% of the profits of Integrity Medical and per his earlier agreement with the Defendant, gave the Defendant 7.5% of the profits.

xx.     The Defendant admits that McKay did not accept French's profit-sharing offer, but she and French instead agreed that she would manage the DME companies to whom R&L was sending leads. To perform this management function, in or about July 2018, McKay opened McKay Management Co. At various times, McKay simultaneously managed: (a) MC Medical; (b) Integrity Medical; (c) Radiance Health Group located in Cape Girardeau, MO and owned by Siples; (d) Cherry Medical Supply located in Chattanooga, TN and owned by Curtis French; (e) Paradise Medical Solutions located in Miami Gardens, FL and owned by Lateese Ford; (f) Helpful Home located in Miami Gardens, FL and owned by Terrance French and Lateese Ford; (g) Perfect Motion located in Holiday, FL and owned by Terrance French; (h) Embrace of Clearwater located in Clearwater, FL, and owned by Lateese Ford; (i) M&M Medical located in Conyers, GA and owned by Marcus Moon; and (j) JLynn Medical Supply located in Atlanta, GA and owned by Lateese Ford. McKay, as directed by French, charged the DME companies $250 for each lead or patient referred to the DME companies.

yy.     McKay assisted French in acquiring and setting up new DME companies, in which French's ownership interest was concealed. French acquired multiple DME companies so that he could "stay under the radar" of Medicare, which was more likely to scrutinize and audit a company submitting a large number of claims for orthotic braces.

zz.     McKay's responsibilities as the manager of these DME companies included handling licensure for the DME companies, completing Medicare enrollment applications for the companies, instructing the office staff at the DME companies how to handle calls from patients, and creating spreadsheets and other documents reflecting the purchase and sale of orthotic braces and reimbursements for the DME. McKay visited each of the DME companies once every three months and was paid $6,500 per month for each DME company that she managed.

aaa.    As a part of her duties, at the end of the month, McKay calculated the total reimbursements received by each DME company and then calculated the 85/15 profit split. For example, McKay determined that in August 2018, Integrity Medical received $213,124.77 in reimbursements for orthotic braces provided to 309 patients. From this reimbursement amount, French and R&L received $77,250, or $250 for each of the 309 patients R&L referred to Integrity Medical, and an additional $55,797.85 as his 85% share of Integrity Medical's profit for the month. Siples received $9,846.68 or 15% of Integrity Medical's profit of $65,644.53 for August 2018. Per his agreement with Siples, the Defendant received $4,923.34 which represented 50% of the amount Siples received.

bbb.    The Defendant admits that he knew the payments to French and R&L and the payments he received were in violation of the federal Anti-Kickback Statute because the payments were solicited, paid, and received for the express purpose of inducing or rewarding French and R&L for referring patients to DME companies for items and services that were reimbursed by Medicare and Medicaid.

ccc.    The Defendant also admits that he knew the DME companies submitted claims for orthotic braces when no physician or qualified health care professional had determined the patients' need for the braces. As an example, the Defendant knew some of the DME companies

submitted reimbursement claims for knee braces and also that range of motion tests had to be performed to determine the medical necessity for knee braces and that the telemedicine doctors signing the orders could not perform the required range of motion tests by phone.

    ddd.    The parties stipulate that a loss of $7,520,779 is attributable to the Defendant as a result of his participation in the health care fraud and illegal kickback scheme and conspiracy described above.

## 5. **STATUTORY PENALTIES**:

    The Defendant fully understands that the maximum possible penalty provided by law for the crime of health care fraud, as charged in Count 1, to which the Defendant is pleading guilty, is imprisonment of not more than 10 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

    The Defendant fully understands that the maximum possible penalty provided by law for the crime of making a false statement concerning a health care matter, as charged in Count 2, to which the Defendant is pleading guilty, is imprisonment of not more than 5 years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

    The Defendant fully understands that the maximum possible penalty provided by law for the crime of offering and paying illegal kickbacks for referrals, as charged in Count 3, to which the Defendant is pleading guilty, is imprisonment of not more than 10 years, a fine of not more than $100,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than 3 years.

**6. U.S. SENTENCING GUIDELINES: 2018 MANUAL:**

The Defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the applicable U.S. Sentencing Guidelines Total Offense Level provisions.

    **a. Chapter 2 Offense Conduct:**

        **(1) Base Offense Level:** The parties agree that the base offense level for Counts 1 and 2 is **6**, as found in Section 2B1.1(a)(2) and the base offense level for Count 3 is **8**, as found in Section 2B4.1.

        **(2) Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply: The offense level should be increased by **18** levels, pursuant to Section 2B1.1(b)(1)(J), because the loss exceeded $3.5 million and did not exceed $9.5 million. The offense level should be increased by an additional **3** levels, pursuant to Section 2B1.1(b)(7), because the offense involves a loss of over $7 million to a Government health care program.

    **b. Chapter 3 Adjustments:**

        **(1) Acceptance of Responsibility:** The parties agree that 3 levels should be deducted pursuant to Section 3E1.1(a) and (b), because the Defendant has clearly demonstrated acceptance of responsibility and timely notified the Government of the Defendant's intention to plead guilty. The parties agree that the Defendant's eligibility for this deduction is based upon information presently known. If, subsequent to the taking of the guilty plea, the Government receives new evidence of statements or conduct by the Defendant which it believes are inconsistent with Defendant's eligibility for this deduction, the Government may present said

20

evidence to the Court, and argue that the Defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

(2) **Other Adjustments:** The parties agree that the following additional adjustments apply: The offense level should be increased by **2** levels, pursuant to Section 3B1.3 because the Defendant abused a position of private or public trust and increased an additional **4** levels, pursuant to Section 3B1.1(a), because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

c. **Other Adjustment(s)/Disputed Adjustments:** None

d. **Estimated Total Offense Level:** The parties estimate that the Total Offense Level is **32.**

e. **Criminal History:** The determination of the Defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the findings of the Presentence Report as to the Defendant's criminal history and the applicable category. The Defendant's criminal history is known to the Defendant and is substantially available in the Pretrial Services Report.

f. **Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:**

**a. Appeal:** The Defendant has been fully apprised by defense counsel of the Defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery, the guilty plea, the constitutionality of the statute(s) to which Defendant is pleading guilty and whether the Defendant's conduct falls within the scope of the statute(s).

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the Defendant within or below that range, then, as part of this agreement, the Defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea and the agreed Total Offense Level and sentences the Defendant within or above that range.

**b. Habeas Corpus:** The Defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The Defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be

sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

## 8. **OTHER:**

    a. **Disclosures Required by the United States Probation Office:** The Defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

    b. **Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the Defendant.

    c. **Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the Defendant and may impose special conditions related to the crime Defendant committed. These conditions will be restrictions on the Defendant to which the Defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the Defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The Defendant understands that parole has been abolished

    d. **Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $300, which the Defendant agrees to pay at the time of sentencing. Money paid by the Defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The Defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision. The Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately. Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c). Regardless of the count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss. The Defendant agrees to provide full restitution to all victims of all charges in the Information.

**g. Forfeiture:** The Defendant agrees to the forfeiture set forth in the Forfeiture Allegation in the Information to which the Defendant is pleading guilty. This agreement includes any items that were seized by law enforcement officials during the course of this investigation. The Defendant also agrees to the entry of a forfeiture money judgment in the amount of restitution determined by the court at sentencing. The Defendant further agrees that the proffer of evidence supporting this guilty plea is sufficient evidence to support such forfeiture.

The Defendant agrees that the Court may enter a consent preliminary order of forfeiture at the time of her guilty plea or at any time before sentencing. The Defendant further agrees that this order will become final as to the Defendant when it is issued and will be part of her sentence pursuant to Fed. R. Crim. P. 32.2(b)(4)(A).

The Defendant agrees that the Government may choose in its sole discretion how it wishes to accomplish forfeiture, whether by criminal or civil forfeiture, using judicial or non-

24

judicial forfeiture processes. The Defendant waives all rights to assert any interest in the forfeited property in the future, and will withdraw any prior claims made to forfeited property, whether they were made in a judicial or non-judicial forfeiture process.

The Defendant agrees (i) to assist the Government in identifying all property that is subject to forfeiture, (ii) to take any and all actions necessary to transfer title and ownership of said property to the Government, and (iii) to help the Government to rebut the claims of nominees and/or alleged third party owners, including by testifying truthfully in any judicial forfeiture proceeding.

The Defendant knowingly and intelligently waives all constitutional and statutory challenges in any manner to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant further knowingly and intelligently waives any rights the Defendant may have (i) for notice of the forfeiture to be given in the charging instrument, (ii) for a jury or the Court to determine what property is subject to forfeiture, (iii) for the Court to explain the forfeiture at the Defendant's change of plea hearing, and (iv) for the forfeiture to be made part of the oral pronouncement of sentence and included in the judgment.

**h.  Admissions:**  Except under circumstances where the Court, acting on its own, fails to accept this plea agreement, the Defendant agrees that, upon the Defendant's signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant's plea hearing, shall be admissible against the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the

Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the Defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the Defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The Defendant further understands that by this guilty plea, the Defendant expressly waives all the rights set forth in this paragraph.

The Defendant fully understands that the Defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The Defendant's counsel has explained these rights and the consequences of the waiver of these rights. The Defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The Defendant is fully satisfied with the representation received from defense counsel. The Defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has

completely and satisfactorily explored all areas which the Defendant has requested relative to the Government's case and any defenses.

The guilty plea could impact Defendant's immigration status or result in deportation. In particular, if any crime to which Defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the Defendant of the possible immigration consequences, including deportation, resulting from the plea.

10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:**

This document constitutes the entire agreement between the Defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the Defendant states that no person has, directly or indirectly, threatened or coerced the Defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The Defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The Defendant further acknowledges that this guilty plea is made of the Defendant's own free will and that the Defendant is, in fact, guilty.

11. **CONSEQUENCES OF POST-PLEA MISCONDUCT:**

After pleading guilty and before sentencing, if the Defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government

may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the Defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

August 17, 2020
Date

*Dorothy L. McMurtry*
DOROTHY L. McMURTRY
Assistant United States Attorney

*August 21, 2020*
Date

*Jamie McCoy*
JAMIE McCOY
Defendant

*Aug 21, 2020*
Date

*Shanna Surratt*
SHANNA SURRATT
Attorney for Defendant